**ROUND et v PLATING &
GALVANIZING CO. et**

Common Pleas Court, Cuyahoga Co.

No. 490867.   Decided April 12, 1940.

By EWING, J.

By this action the plaintiffs, Raymond L. Round and Thornton E. Round, in their capacity as ancillary administrators with will annexed of the estate of Louis D. Round, deceased, are seeking a declaratory judgment to determine the ownership and legal character of certain buildings located upon a parcel of land of which the decedent at the time of his death held title.

The pleadings disclose that one of these buildings is occupied by and in possession of the defendant The Plating & Galvanizing Company; that the rest of them are occupied by and in possession of defendant, The Cleveland Chain & Manufacturing Company; that these defendants claim to own the buildings respectively occupied by them, as distinguished from the land on which the buildings stand. The remaining defendants comprise all devisees and legatees named in the will of Mr. Round, and all heirs at law of his estate and include the same two persons who are plaintiffs, and who by devise in the will have legal title to the land.

There is no dispute upon the facts, nearly all of which are presented by written stipulation of the parties, which has been supplemented by certain explanatory evidence which is entirely uncontradicted.   The facts shown are briefly as follows:

At the time of his death, Mr. Round was the owner of a tract of land containing about fourteen acres located along the Pennsylvania Railroad and fronting upon Henry street in Garfield Heights, Cuyahoga County, Ohio, which had been acquired by him in 1907, and held continuously thereafter until his death.   Shortly after acquiring it, an oral agreement was made between him and the Cleveland Chain & Manufacturing Company by which he leased* to that company, without definite agreement as to length of term, so much of that land as it might find necessary or desirable to use for the construction thereon of such buildings as it might require for the proper conduct of its business in consideration of its agreeing to pay all taxes assessed against the said land and the improvements to be placed thereon, including such improvements as Round himself might construct for his own personal benefit and purpose.   Mr. Round then owned, and continued until the time of his death

---

*This characterization of the arrangement as a lease was contained in the agreed statement of facts.   The court believes it might be described more accurately as an oral license.

to own, at least 70% of the outstanding capital stock of that company, and was the president and director of that company throughout the whole period involved. Under favor of this arrangement, the Cleveland Chain & Manufacturing Co. at various rates caused to be erected upon said lands a total of seven buildings for which it paid from its corporate funds the aggregate sum of One Hundred and Ninety-three Thousand, Five Hundred and Two Dollars and Eighty-nine One Hundredths Dollars ($193,502.89) the erection of said buildings and the expenditure of said corporate funds having been duly authorized at meetings of the directorate at which the decedent was present and participated. Similarly, by an oral agreement between decedent and the defendant, The Plating & Galvanizing Company, that company in 1935 erected one building on the land for which it paid from its corporate funds Forty-five Thousand Six Hundred and Seventeen Dollars and Seventy-eight One Hundredths Dollars ($45,617.78).

At the date of this arrangement and at all times thereafter until his death, Mr. Rounds owned 70% of the capital stock of The Plating & Galvanizing Company, and was its vice-president and one of its directors. The erection of this building and the expenditures therefor were duly authorized by corporate action in which Mr. Round participated. The arrangement with this company as to its payment of taxes differed from the earlier arrangement with The Chain & Manufacturing Company only in the particular that the Plating Company's proportion of taxes was to be paid through The Chain & Manufacturing Company.

Annually, in each year since the construction of the buildings above mentioned, each corporation made reports for tax purposes to Federal and State taxing authorities which included balance sheets showing its assets for the current year. These balance sheets at all times included among the capital assets respectively of each corporation the value of such of the buildings above mentioned as were then in existence and being used by each corporation. These returns were made with Mr. Round's knowledge, and in many instances were executed by him as an officer of the company making the return. Each corporation also issued various financial statements for purposes of credit or credit rating, which statements included among the corporate assets respectively of each company such buildings as had been erected by that company at their current value. Some of these statements were prepared by Mr. Round himself, and it may reasonably be inferred that they were all issued with his knowledge and approval. Some of them contained recitals indicating that the land, as distinguished from the buildings, was owned by him.

In addition to the buildings built by the respective corporations, Mr. Round himself constructed two buildings, one of which, known as the Round Shop, was used by himself in the business which he conducted individually, and the other was leased by him to The Aluminum Industries Company, all rentals for the same being collected by and retained by him individually. He also built at his own expense an addition or extension to the foundry building which had been built by The Chain & Manufacturing Company. This addition appears to have been about equal in size to the building to which it was added and was used by him for his separate individual business.

The last will and testament of Louis D. Round contained one provision with reference to the whole parcel of land and the buildings constructed by himself thereon which reads as follows:

"I give, devise and bequeath, in equal portions, unto my two (2) sons, Raymond L. Round and Thornton E. Round, both of Cleveland, Ohio, or in the event one or both of them should predecease me, then to his or their respective issue, per stirpes and not per capita, all of the land located along the Pennsylvania Railroad at Henry street, in the city of Cleveland, Ohio, which was purchased by me from Mrs. Wagner, or the

Wagner Estate, together with the buildings, factories and shops located thereon and which are owned by me but occupied by the Round Shop and the Aluminum Industries Company; also my undivided one-half (½) interest in the foundry building located on said land."

No stipulation was ever made between Mr. Round and either of the companies that the buildings erected by the respective companies were to be considered part of the land and become his property, nor did he at any time make claim that he was the owner of the buildings erected by the defendant corporations, or that such buildings were part and parcel of the land upon which they were erected.

The Cleveland Chain & Manufacturing Company throughout the entire period paid all taxes assessed upon the land and improvements thereon, including the improvements erected by Mr. Round himself; and the Plating & Galvanizing Company after the erection of its building at all times paid its proportionate share of such taxes to The Chain & Manufacturing Company. Both companies have continued since his death in active operation and in the use and occupancy of the buildings respectively constructed by them.

By stipulation of the parties orally agreed to be received in lieu of evidence during trial, it appears that two of the buildings involved in the present controversy were built of brick; that the remainder of the buildings are of the type known as structural steel frames; and that it would be feasible to remove all of these buildings from tne premises by modern methods without destroying them and without substantial injury to the land.

The court is indebted to counsel on both sides for carefully prepared briefs with extensive and impartial presentation of legal authority applicable to the foregoing facts. While these briefs contain numerous citations from decisions in this state, which may justly be considered relevant to the questions in controversy, they disclose no decision in this state upon facts closely resembling the present case nor which can justly be claimed to be determinative of this case. However, as revealed by the briefs and by independent research of the court, there is a very substantial volume of authority in other jurisdictions more closely related to the present controversy. Before reviewing Ohio decisions, time and space may therefore be saved by first examining the law outside this state, with which, in the court's opinion, it will eventually appear that our own decisions are not in conflict.

A convenient summary of the American Law as to fixtures is found in 22 American Jurisprudence, pages 775 to 784, Sections 61 to 66, inclusive.

It may suffice here to quote from the sections devoted particularly to buildings beginning at page 778, as follows:

"Section 63, Buildings. Whether or not a puilding erected on land is a fixture depends, as in other cases generally, upon the mode of attachment or annexation, the character of the structure, the intention of the person making the annexation, and the relationship of the parties. As a general rule, a building on land is considered as a part of the realty, or, at least, it is so presumed; and the burden of proof is upon the party who claims that it is personal property to show that it retains that character. * * * Where the person who erects a building is not an ordinary trespasser, and both he and the owner of the land understand that the building is, and intend that it be, a mere temporary structure, to be used only for certain purposes, it is not a fixture. * * * "

Page 780:

"Section 64. Effect of Consent or License to Erect. Generally a building erected on the land of another by his consent or license does not become part of the realty, but remains tne property of the person annexing it. * * * This rule certainly holds when there is an express reservation of a right to re-

move the building; and generally it is considered that where the land owner consents to the placing of a building on his land by another without an express agreement as to whether it shall become a part of the realty or remain personalty, an agreement will be implied that such building is to continue personal property, in the absence of any other facts or circumstances tending to show a different intention."

Page 782:

"Section 65. Buildings Erected by Tenants. In accord with the general exception favoring tenants which permits them to remove improvements placed upon the leased property, with respect to buildings erected by a tenant, the rules are more favorable to the tenant than to persons in other relations to the owner of the realty. The presumption is in favor of the right of a tenant to remove buildings which he has placed on the leased property for his own purposes. A lessor and lessee may, of course, enter into an agreement that a building erected by the lessee shall remain the property of the lessee and may be removed by him on the expiration of his term. Independent, however, of any agreement, the intention of the lessee has much to do with the question; and if his intention is that the building shall remain his personal property and that intention is made known and his acts are consistent therewith, the building may remain his personal property, unless its mode of annexation is such that it can not be moved. * * *."

Page 783:

"Section 66. As Trade Fixtures.—Although the courts on occasion have indicated that the rule in respect of 'trade fixtures' has no application to buildings, such an idea has not, in general, been followed. The question as to whether a building is or is not a trade fixture is not dependent upon such factors as its size, foundation, method of construction, etc., but the sole question is whether the building is designed for purposes of trade, and if so designed, it is a trade fixture and is removable by the tenant irrespective of other factors."

The general review of the law from which the foregoing excerpts are taken is of course an amplification of the earlier digest of the same subject in Ruling Case Law, Vol. 11. A similar comprehensive review of the law is found in Volume 26 of Corpus Juris, page 649, et sequenti, in which the text under the special heading "Intention" at pages 654 to 658 contains much that is precisely applicable to the present controversy. Some phases of the question are also covered by the section on "Improvements with owner's permission," at Vol. 31, Corpus Juris, page 310.

An extensive annotation, which will be found particularly helpful and is limited to the subject of "buildings erected by a tenant as trade fixtures," will be found at Volume 107, A. L. R., page 1153.

One of the early leading cases upon this subject, and the one which has probably been cited most frequently, is the case of Van Ness v Pacard, reported in 2 Peters (U. S.) 137, with an opinion by Mr. Justice Story. This case, which was decided in 1829, reached the U. S. Supreme Court by reason of its having originated in the District of Columbia. The question at issue was the right of the tenant at the expiration of a seven year lease to remove a two story building erected by the tenant during his term, having a lower story adapted in part to the preparation and storage of milk in connection with a retail dairy and milk delivery business in which he was engaged, and in part to carpentry to which he devoted part of his time, while the remainder of the structure was adapted to and occupied by the tenant and his family as their residence throughout the term. The gist of the decision so far as the present case is concerned, will appear by two paragraphs of the syllabus:

"The question whether fixtures erected for the purposes of trade are or are not removable by the tenant, does not depend upon the form or size of the building; whether it has a brick foundation or not, or is one or two stories high, or has a brick or other chimney; the sole question is, whether it is designed for the purposes of trade or not.

"If the house were built principally for a dwelling house for the family, independently of carrying on a trade, then it would, doubtless, be deemed a fixture, falling under the general rule, and irremovable; but if the residence of the family were merely an accessory for the more beneficial exercise of the trade, and with a view to superior accommodation in this particular, then it is within the exception."

This case will further be found interesting by reason of its extensive review of the English cases showing that the doctrine favoring the right of the tenant to remove structures erected during term had long been recognized by the English courts.

Among the most recent cases squarely upon the point is the case of Cameron v Oakland County Gas & Oil Company, 277 Mich., 442 (also reported at 107 A.L.R., 1142, and being the case under which the annotation mentioned above is found). In holding that the tenant who had erected buildings on the leased premises for the purpose of operating an oil and gas station had a right to remove the buildings during the continuance of his lease, or within a reasonable time after its expiration, although the lease contained no provision on that subject, this court ruled as shown by two paragraphs of the syllabus as follows:

"2. Common Law—England-America Adaptation. The common law of England is not to be taken, in all respects, to be that of America, but only that portion applicable to the situation here at the time of its adoption.

"3. Fixtures—Trade Fixtures—Removal—Public Policy. Right of a tenant to remove erections made by him in furtherance of the purpose for which the premises were leased is founded upon public policy and has its foundation in the interest which society has that every person shall be encouraged to make the most beneficial use of his property under the circumstances."

Other recent cases squarely in point to which it may suffice to call attention without citing from them, are the following: Workmen v Henrie, 71 Utah, 400; Hartberg v American Founders Sec. Co., 221 Wisc., 249; McClintic-Marshall Co. v Ford Motor Co., 254 Mich., 305; Springs v Atlantic Refining Co., 205 N. C., 444; Standard Oil Co. v Service Station, 258 N. W. 791, (Wisc.); In re: Montello Brick Works (1908) D. C., 163 Fed. 624; Smith v Whitney, 147 Mass., 479, (1888); Dugan v H. J. Grell Co., 174 Wisc. (1921); Welsh v McDonald, 64 Wash. 108 (1911); Adalia Realty Co. v Norman, 183 S. W. Mo. 348 (1916); Zeigler v Lexington Co., 105 Miss., 820 (1913).

After careful review of all these authorities and many others, it may confidently be asserted that by the overwhelming weight of authority in the United States, it is the established rule that, in the absence of an agreement to the contrary or facts clearly showing a contrary intention, structures erected by the tenant during his term and practically susceptible of severance and removal may be removed by the tenant at the end of his term or within a reasonable time thereafter.

While in the earlier cases this rule is more frequently based upon grounds of public policy for the encouragement of trade and the fullest profitable use of the leased premises, the strong general trend of the more recent decisions is to the effect that the contract for removal of such structures should be implied under the doctrine of unjust enrichment, and that the intention of the parties as affected by the special relationship of landlord and tenant and inferred from all other circumstances in the case, constitutes the paramount and controlling test.

The leading Ohio case on the subject of trade fixtures is, of course, **Teaff v**

Hewitt, 1 Oh St 511. Indeed this case may justifiably be regarded as one of the leading American cases on the subject and it is cited in the footnotes to the sections of American Jurisprudence above mentioned, in support of the general principles above quoted. As regards the matters actually determined, this decision is not closely applicable to the present controversy. since the case did not involve the question of removability of buildings nor the relation of landford and tenant. So far as the case reserved to the Supreme Court was concerned, it was a controversy between the holder of a mortgage on the land and judgment creditors of the mortgagor who had levied on the machinery and connective appurtenances of a woolen factory which the mortgagor had been operating upon the mortgaged premises. All that was necessary for the court to decide, or that was decided, was that this machinery and its appurtenances, (excluding the engine and boiler which. had been held to be part of the freehold by an earlier judgment in part of the case which had not been appealed) were chattel property although attached to a certain extent to the building, and were not part of the realty nor covered by the mortgage on the realty. But in arriving at this conclusion, Judge Bartley took advantage of the opportunity to make a comprehensive and masterly review of the law of other jurisdictions, and to derive therefrom a general formula for determining what should be considered a fixture. Of the three requirements thus laid down by this learned jurist as essential to change the character of property from chattel to real, namely, physical annexation, either actual or constructive; adaptation to the use to which the premises were appropriated; and intention to make a permanent annexation to the freehold, he clearly puts greatest emphasis upon intention, and expressly declares that the existence of intention to make permanent annexation is indispensable:

(p. 533).

"But if the third requisite of a fixture here adopted had been applied in the numerous cases of exceptions in favor of tenants, also in favor of trade and manufacture, and in favor of matters of ornament and domestic convenience, which fill so much space in the books, there would have been but little difficulty in determining that they were not fixtures. In all these cases denominated exceptions, the article could invariably have been removed without essential injury to the freehold or the article itself. **In no case is a fixture created without the apparent intention of the party making the annexation to make a permanent accession to the freehold.**"

It will thus be seen that this decision is in harmony with the general principles quoted earlier and that in that case Judge Bartley intended to lay, and actually did lay, a broad and sound foundation for the development of our law in accordance with that general rule.

The next case which appears to be pertinent to the present question is that of Corwin v Cowen et, 12 Oh St 629. In that case the Warren County Canal Company had by appropriation acquired an easement to take and use land for the construction of a canal and had done a large part of the work of constructing the same after which all its rights, under favor of enabling legislation, were taken over by the state, which later abandoned the canal resulting in reversion of the land to the former owner. The essence of the decision is found in the third syllabus:

"Such reversion did not carry with it the ownership of the materials used in the construction of the locks. etc., upon the canal. Those structures never having been intended as annexations to the freehold, and having been rightfully erected, may be removed by the assignee of the state, upon such terms as may, under the circumstances of the case, be equitable."

A closely related case is that of **Wagner v The Cleveland & Toledo Railroad Co., 22 Oh St, page 563.** In that case the railroad company had constructed stone piers and abutments for a bridge, firmly embedded in the earth on land over which it had acquired the right of way for the road, but had subsequently abandoned the purpose of completing the railroad. It was held that under such circumstances the railroad company had the right to remove such structures as personal property and that by preventing such removal several years after the construction of the road had been abandoned, the land owner became liable in conversion. By the decision in this case, after first pointing out that in order to determine the question whether a chattel, by annexation, has been incorporated into the realty so as to become part of it, the purpose for which the annexation was made must be considered as well as the relationship of the parties concerned both before and after the annexation; and that the mode of annexation alone will not determine the character of the property annexed, the court said:

(page 577)

"* * * The general principle to be kept in view, which underlies all questions of this kind, is the distinction between the business which is carried on in or upon the premises, and the premises, or locus in quo. The former is personal in its nature, and articles that are merely accessory to the business, and have been put on the premises for this purpose, and not as accessions to the real estate, retain the personal character of the principle to which they appropriately belong and are subservient. But articles which have been annexed to the premises as accessory to it, whatever business may be carried on upon it, and not peculiarly for the benefit of a present business, which may be of a temporary duration, become subservient to the realty, and acquire and retain its legal character."

It has been repeatedly held by our Supreme Court that articles annexed to the realty by contract of the parties, and which might but for agreement of parties be a part of the realty may by force of such contract, retain or acquire the character of chattel property. **Haflick v Stober, 11 Oh St 482; Fortman v Goepper, 14 Oh St 558; Brennan v Whitaker, 15 Oh St 446; Simons v Pierce, 16 Oh St 215; Long v White, 42 Oh St, page 59; Case Manufacturing Co. v Garvin, 45 Oh St 289.**

In the case last cited and in the earlier case of **Brennan v Whitaker,** supra, it is held that such agreement of the parties will not be given effect against a mortgagee of the premises, having no notice of such agreement. In any event these cases have little, if any, bearing upon the present case.

A case which seems clearly to be closely related by analogy to the present case is that of **Wittenmeyer v The Board of Education of Brooklyn,** decided in 1895 by the Circuit Court of this county and reported at **10 O. C. C. R., page 119.** In that case, with opinion by Judge Marvin, it was held that a building erected by the lessee upon leased land, for use exclusively as a schoolhouse, was governed, as to the right of removal, by the same rules of law which govern in the case of buildings erected by a lessee for purposes of trade, and that in the absence of any express agreement on the subject, and when the duration of the term of the lease was dependent on a contingency over which the lessee had no control, such building might be removed within a reasonable time after the expiration of the term.

The right of the tenant to remove structures erected by him during his term for purposes of his business has similarly been recognized in a case recently decided by the Court of Appeals of the 6th District, viz: **Martin v Pilaczynski, 63 Oh Ap 101, 16 OO 379,** although the majority of the court held that in that case the character and manner of construction of the building was such as to negative an inference of intention to remove the same.

From this review of the Ohio decisions covering all the cases cited in the briefs and all that the court has found which appear pertinent, the court concludes that there is no controlling decision in this state in conflict with the general rule found elsewhere and quoted earlier in this opinion. Applying the foregoing principles to the undisputed facts of the present case, it seems clear that as between Mr. Round and these defendant corporations there was complete concurrence of intention and mutuality of understanding that the buildings erected by the respective corporations were to be regarded as personal property of such corporations and were not to become part of the freehold, but were to be subject to severance at any time. Such an intention of the corporations, of course, appears by their conduct in carrying the buildings on their books as assets of the respective corporations and including them in the same fashion in their reports for tax purposes and statements for purposes of credit. A corresponding intention and understanding on Mr. Round's part must be inferred from his participation, without objection in this manner of keeping the corporate books and in the making of these reports and statements, and is similarly shown by the provision of his will expressly disposing of only the buildings owned by him individually and thus by a familiar rule of interpretation excluding all the buildings involved in the present controversy.

Upon the findings of fact thus sufficiently indicated, the court therefore holds as matter of law that all the buildings in controversy are removable at any time, either before or at the expiration of the lease, or within a reasonable time thereafter, at the option of the respective corporations, and that as between all parties to this action, these buildings are, and should for all purposes be regarded, as chattel property belonging respectively to the corporations which erected them. Findings and decree in the form of a declaratory judgment may accordingly be prepared in accordance with this opinion with exceptions in favor of any party who may desire an exception to be noted.